UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DAREN WATSON and CYRIL LEWIS,
on behalf of themselves and on                           Case No. 13-CV-0684 (LDW)(GRB)
behalf of all other persons similarly situated,

                         Plaintiffs,            **DEFENDANTS' LOCAL CIVIL**
       -against-                                        **RULE 56.1 STATEMENT OF**
                                                          **MATERIAL FACTS**

VISIONPRO COMMUNICATIONS CORP.,
VISIONPRO CORP., KEVIN SILVAR and
JOSEPH ROMANO,

                         Defendants.
-------------------------------------------------------------X

**PLEASE TAKE NOTICE,** that pursuant to Local Civil Rule 56.1 and in support of Defendants VisionPro Communications Corp., VisionPro Corp., Kevin Silvar, and Joseph Romano's ("Defendants") motion for summary judgment pursuant Rule 56 of the Federal Rules of Civil Procedure, as and for their Statement of Material Facts on a Motion for Summary Judgment, Defendants set forth the following:

**KEY**

- Please let "Romano Decl." refer to the accompanying "Declaration of Joseph Romano in Support of Defendants' Motion for Summary Judgment."
- Please let "Meyer Decl." refer to the accompanying "Declaration of Jeffery A. Meyer in Support of Defendants' Motion for Summary Judgment."

| NO. | STATEMENT OF MATERIAL FACT | SOURCE |
|---|---|---|
| 1. | VisionPro Communications Corp. is an inactive entity, which was succeeded in operations by .VisionPro Corp. (hereinafter "VisionPro"). | Romano Decl. ¶ 2 |
| 2. | VisionPro provides data, voice, fiber & cable installation, repair, maintenance, and problem solving services for residential and commercial customers of telecommunication providers. VisionPro's largest current contracted telecommunication provider whom it provides services for is Cablevision Systems Corporation | Romano Decl. ¶ 3 |

1

| | | |
|---|---|---|
| | ("Cablevision"). | |
| 3. | One hundred percent of VisionPro's annual revenues are derived from its sale of cable/broadband installation and repair services. | Romano Decl. ¶ 4 |
| 4. | VisionPro does not believe that the services it provides customers are in any way being resold by customers. | Romano Decl. ¶ 6 |
| 5. | Joseph Romano handles payroll structuring for VisionPro. | Meyer Decl., Ex. E, Romano Tr., 15: 6–13 |
| 6. | VisionPro changed its compensation policy for its technicians after a 2011 wage and hour lawsuit. The policy changed to a commission based policy and an hourly based policy. | Meyer Decl., Ex. E, Romano Tr., 7: 2–20; 15: 14–25; 16: 2–25; 17: 2-19 |
| 7. | VisionPro treats its technicians as exempt from the overtime requirements provided by federal and state law. | Meyer Decl., Ex. E, Romano Tr., 45: 9–13; |
| 8. | VisionPro's Employee Handbooks for Technicians set forth that technicians are eligible for commissions pursuant to the terms and conditions of the VisionPro Technician Commission Agreement. | Romano Decl., Ex. P, "VisionPro Corp. Employee Handbook for Technicians" pp. 10 |
| 9. | VisionPro provides its technicians a percentage of what Cablevision pays for any task performed. VisionPro is paid directly by Cablevision, not by Cablevision's customers. | Meyer Decl., Ex. E, Romano Tr., 42: 5–25; 43: 2–25; 44: 2–23; 48: 21–25; 49: 2–18; Romano Decl. ¶ 8; |
| 10. | Cablevision pays different rates for various tasks performed by VisionPro. | Romano Decl. ¶ 9; Romano Decl., Ex. G, "Residential Suburban Credits" |
| 11. | Weekly VisionPro Commission Summaries were produced by the company in connection with their employment with Daren Watson and Cyril Lewis and were kept in the regular course of business by the company. | Romano Decl. ¶ 16; Romano Decl., Ex. H & I, "Weekly Vision Pro Commission Summaries" |
| 12. | Commissions earned by technicians are recorded on their respective Weekly VisionPro Commission Summaries as credits. | Romano Decl. ¶ 13 |
| 13. | Column 1 of the lower right of the each Weekly VisionPro Commission Summaries, titled "Total Gross Credits" states the gross credits earned by an employee during a workweek. | Romano Decl. ¶ 16; Romano Decl., Ex. H & I, "Weekly Vision Pro Commission |

| | | |
|---|---|---|
| | | Summaries" |
| 14. | One credit on a Weekly VisionPro Commission Summary is equivalent to one dollar. | Meyer Decl., Ex. E, Romano Tr., 54: 20—23; Romano Decl. ¶ 16; |
| 15. | Weekly VisionPro Commission Summaries for Daren Watson and Cyril Lewis has the "Total Gross Credits" Column in the lower right of these documents generally equal the "TOTAL WEEKLY GROSS COMPENSATION" column, also in the lower right of those documents. | Romano Decl. ¶ 16 |
| 16. | Technicians are actually paid the amount set forth as the "TOTAL WEEKLY GROSS COMPENSATION" on their respective Weekly VisionPro Commission Summaries, subject to permissible deductions and taxes. | Romano Decl. ¶ 16 |
| 17. | Technicians' earnings are comprised of more than 50% commissions by way of their commission credits. | Romano Decl. ¶ 17 |
| 18. | Daren Watson and Cyril Lewis's "TOTAL WEEKLY GROSS COMPENSATION" fluctuated week to week based on the type of work done and the amount of work done. | Romano Decl. ¶ 16 |
| 19. | Column 7 in the lower right of the Weekly VisionPro Commission Summaries, titled "Minimum Commission Payment Period," sets forth the minimum guaranteed payment, inclusive of overtime, an employee may earn for the hours the employee reported as working during a workweek. | Meyer Decl., Ex. E, Romano Tr., 56: 13–25; 57: 2–19 Romano Decl. ¶ 12; *see generally* Romano Decl., Ex. H & I, "Weekly Vision Pro Commission Summaries" |
| 20. | Each of the Weekly VisionPro Commission Summaries for Daren Watson and Cyril Lewis lists the "TOTAL WEEKLY GROSS COMPENSATION" as an amount greater than the "Minimum Commission Payment Period." | Romano Decl. ¶ 15; Romano Decl., Ex. H & I, "Weekly Vision Pro Commission Summaries" |
| 21. | VisionPro's Employee Handbooks for Technicians state that the VisionPro Technician Agreement "ensures that Technicians receive a steady stream of income by guaranteeing all Technicians the opportunity to earn a weekly payment of at least $8.10 per hour for all hours worked up to 40 in a week and $12.15 per hour for all hours over 40 in a week (the "Minimum Commission Payment Period"). Typically, however, Technicians will be eligible to receive commissions well above that amount each week." | Romano Decl., Ex. P & Q, "VisionPro Corp. Employee Handbook for Technicians" pp. 10 of each exhibit. |

3

| | | |
|---|---|---|
| 22. | The 2011 Technician Commission Agreement, the 2012 Technician Commission Agreement, and the 2013 Technician Commission Agreement each sets forth (in their respective sections (C)(b)(i) in pertinent part) that a technician generates each week gross credits equal to a percentage of the amount paid to VisionPro in exchange for services provided to customers. | Romano Decl., Ex. L, M, & N, "2011, 2012, and 2013 Technician Commission Agreements" pp. 2 of each exhibit. |
| 23. | The 2011 Technician Commission Agreement, the 2012 Technician Commission Agreement, and the 2013 Technician Commission Agreement each state in their respective sections (C)(a) that "[t]o provide stability to Technicians through downside protection, each Technician will be paid the Minimum Commission Period Payment (defined below) for any Commission Period during which the commission advance that a Technician is eligible to receive does not exceed the Minimum Commission Period Payment." | Romano Decl., Ex. L, M, & N, "2011, 2012, and 2013 Technician Commission Agreements" pp. 1 of each exhibit. |
| 24. | The 2011 Technician Commission Agreement, the 2012 Technician Commission Agreement, and the 2013 Technician Commission Agreement each state that a technician's unearned adjusted credits may be adjusted downwards if a technician incurred a parking ticket or other moving violation or has lost any tools or equipment. | Romano Decl., Ex. L, M, & N, "2011, 2012, and 2013 Technician Commission Agreements" pp. 2 of each exhibit. |
| 25. | VisionPro's technicians' entire weekly compensation, except for any extra out of area travel pay, is based on their commissions if their commissions exceed the Minimum Commission Period Payment. | Romano Decl. ¶ 13; Meyer Decl., Ex. E, Romano Tr., 55: 7–25; 56: 2–9 |
| 26. | Technicians report the number of hours they work on their daily time sheets which they complete and sign. | Meyer Decl., Ex. E, Romano Tr., 58: 2-11; 59: 25; 60: 2–15 |
| 27. | Technicians are informed that they must record the time they arrive at the shop to receive their work assignments for the day. | Meyer Decl., Ex. E, Romano Tr., 60: 16–25; 61:2-5 |
| 28. | The VisionPro Employee Handbook for Technicians has a provision which states in pertinent part that "Technicians are responsible for accurately reporting all hours worked and for confirming the accuracy of the reported work hours and other information in the weekly commission statement provided to them.  Technicians are prohibited from working unreported hours ("off-the-clock" work) and will be subject to discipline, which may include termination, for such conduct or otherwise failing to correct any inaccurate information in the weekly commission statement. | Romano Decl., Ex. P & Q, "VisionPro Corp. Employee Handbook for Technicians" pp. 10 of each exhibit. |
| 29. | The VisionPro daily timesheets used by technicians to record their hours work set forth "I certify that this daily work sheet reflects a true and actual representation of all jobs and hours worked by me on the work date specified.  I also certify that I have taken my | Romano Decl., Ex. P & Q, "VisionPro Daily Time sheets"; Romano Decl. ¶ 21. |

4

| | | |
|---|---|---|
| | mandatory 30 minutes break for the work date specified." | |
| 30. | The 2011 Technician Commission Agreement, the 2012 Technician Commission Agreement, and the 2013 Technician Commission Agreement each state in their respective sections (C)(c) that "Technicians are responsible for accurately reporting all hours worked and for confirming the accuracy of the reported work hours and other information in the weekly commission statement provided to them. Technicians are prohibited from working unreported hours "off-the-clock" and will be subject to discipline, which may include termination, for such conduct or otherwise failing to correct any inaccurate information in the weekly commission statement. Although lunch periods are typically unpaid, Technicians should report as hours worked all lunch periods during which they were not completely relieved of duty for 30 minutes." | Romano Decl., Ex. L, M, & N, "2011, 2012, and 2013 Technician Commission Agreements" pp. 3 of each exhibit. |
| 31. | The Policy of Recording Hours Worked sets forth in pertinent part: "Every technician who works more than 6 hours <u>must</u> take a half-hour lunch break, during which no work is performed. In the event that for some unexpected reason a technician takes less than or more than half-hour for lunch on a given day, he or she is required to immediately notify the office so that an adjustment can be promptly made." | Romano Decl., Ex. R & S, "Policy of Recording Hours Worked" |
| 32. | The Policy of Recording Hours Worked sets forth in pertinent part: "All technicians who take our trucks home and do not return to the facility at the end of the work day are required to call into our dispatch office and report the end time of their last job. All technicians who bring trucks back to our facility at the end of the work day are required to scan themselves out at that time. These procedures must be followed and there will be no exceptions." | Romano Decl., Ex. R & S, "Policy of Recording Hours Worked" |
| 33. | Technicians are forbidden from not taking a break for lunch, and have been informed of this at numerous meetings. | Meyer Decl., Ex. E, Romano Tr., 61:21–25; 2–8 |
| 34. | Cyril Lewis skipped lunch and he never told a manager. | Meyer Decl., Ex. D, Lewis Tr., 52: 19–25; 53: 2–25; 54: 2–19; |
| 35. | Technicians are responsible to determine the number of hours upon which the minimum commission period is based, and they are provided a VisionPro Commission Summary with each paycheck to verify their hours. | Meyer Decl., Ex. E, Romano Tr., 57: 20–25; 58: 12–24 |
| 36. | Daren Watson worked at VisionPro for approximately one year, and began working in February 2012. | Meyer Decl., Ex. C, Watson Tr., 15: 10–12; 60: 4–8 |
| 37. | Daren Watson worked applied for a job as a technician and worked as a technician. | Meyer Decl., Ex C, Watson Tr., 66: 19–22; 68: 20-22 |

5

| 38. | Daren Watson installed and engaged in troubleshooting cable equipment for residential and commercial users in Nassau and Suffolk County. | Meyer Decl., Ex C, Watson Tr., 68: 20–25; 69: 2-8 |
|---|---|---|
| 39. | Technicians travel out into the field each day to go on service call and perform customer installation and service requests. | Romano Decl. ¶ 5. |
| 40. | Daren Watson made full installations of services Cablevision offered. | Meyer Decl., Ex C, Watson Tr., 69: 7–12 |
| 41. | Daren Watson doesn't recall if he could up-sell or seek to upgrade customers. | Meyer Decl., Ex C, Watson Tr., 69: 17–25; 70: 2–20 |
| 42. | Daren Watson believes he was paid on a piece-rate-basis because of the way he was paid while working at VisionPro, and he has "no idea" what his pay was based on. | Meyer Decl., Ex C, Watson Tr., 57: 19–25; 58: 2–12 |
| 43. | Daren Watson signed a 2012 VisionPro Technician Commission Agreement while working at VisionPro. | Meyer Decl., Ex. C, Watson Tr., 40: 25; 41: 2–19; 42: 7–10 |
| 44. | Daren Watson did not read the commission agreement when he signed it and has not read it fully after he signed it. | Meyer Decl., Ex. C, Watson Tr., 57: 7–18; 58: 13–15; 66: 10–18 |
| 45. | Daren Watson signed the Acknowledgement of Receipt and understanding of the VisionPro Corp. Employee Handbook for Technicians. | Meyer Decl., Ex. C, Watson Tr., 63: 8–25; 64: 2–6 |
| 46. | Daren Watson has never read the compensation policies in the VisionPro Corp. Employee Handbook for Technicians. | Meyer Decl., Ex. C, Watson Tr., 64: 12–25 |
| 47. | Daren Watson signed a copy of the Policy on Recording Hours Worked. | Romano Decl., Ex. R, "Policy of Recording Hours Worked" |
| 48. | Daren Watson received varying amounts of money depending on the hardware he installed, but he does not know how that number was arrived at. | Meyer Decl., Ex. C, Watson Tr., 76: 5–20 |
| 49. | Daren Watson called the police in connection with a customer who called him a racial epithet. | Meyer Decl., Ex. C, Watson Tr., 83: 24–35; 85: 3–25; 86: 2–5 |
| 50. | Daren Watson was suspended after the incident with the customer. | Meyer Decl., Ex. C, Watson Tr., 89: 5–17 |
| 51. | VisionPro was instructed by Cablevision that Daren Watson should be removed of the technician system immediately. Cablevision was irate about Daren Watson's altercation with a customer. | Meyer Decl., Ex. E, Romano Tr., 70: 23–25; 71: 2–18; Meyer Decl., Ex. F, Silvar Tr., 10: 7–25 |

| | | |
|---|---|---|
| 52. | Joseph Romano and Kevin Silvar "fought for" Daren Watson to get his position back by informing Cablevision that Watson's customer satisfaction rating would improve. | Meyer Decl., Ex. E, Romano Tr., 71: 19–25; 72: 2–25; 73: 2–25; 74: 2–4; |
| 53. | Damion, another employee of VisionPro, informed Daren Watson that he was allowed to return to work but that his post-call customer surveys would have to stay above the required 92 percent. | Meyer Decl., Ex. F, Silvar Tr., 13: 24–25; 14: 2–15 |
| 54. | Kevin Silvar met with Daren Watson on February 11, 2013 to tell him his post-call surveys were "way below" the required 92 percent and that he would need to improve these numbers immediately. | Meyer Decl., Ex. F, Silvar Tr., 16: 2–9; 21: 18–25 |
| 55. | Kevin Silvar observed that Daren Watson became annoyed and agitated with him at the meeting. | Meyer Decl., Ex. F, Silvar Tr., 24: 11–20 |
| 56. | Kevin Silvar felt that Daren Watson was very aggressive in that meeting, and that he would not want Daren Watson in a customer's home. | Meyer Decl., Ex. F, Silvar Tr., 24: 21-25; 25: 2–16 |
| 57. | Kevin Silvar felt that the Daren Watson's body language during the meeting was not good. | Meyer Decl., Ex. F, Silvar Tr., 25: 17–25 |
| 58. | Daren Watson was terminated on February 11, 2013. | Meyer Decl., Ex. F, Silvar Tr., 7: 14–19 |
| 59. | Kevin Silvar first learned that Daren Watson and Cyril Lewis commenced an action against VisionPro on or about February 19, 2013. | Meyer Decl., Ex. F, Silvar Tr., 6: 8–25; 7: 2–9; 26: 10–14 |
| 60. | Kevin Silvar was not aware of the fact that Daren Watson and Cyril Lewis had commenced an action when Watson's employment was terminated. | Meyer Decl., Ex. F, Silvar Tr., 7: 10–13 |
| 61. | Joseph Romano did not discuss the lawsuit filed by Daren Watson with Kevin Silvar prior to Kevin Silvar's termination of Daren Watson. | Romano Decl. ¶ 22. |
| 62. | Joseph Romano had no input on the meeting called originally initiated by Kevin Silvar on February 11, 2013 to discuss with Daren Watson his customer satisfaction ratings. | Romano Decl. ¶¶ 22–23. |
| 63. | Cyril Lewis began working for VisionPro in October 2011. | Declaration of Jeffery Meyer in Support of Defendants' Motion for Summary Judgment, Exhibit C, Transcript of Cyril Lewis February 20, 2014 Deposition (hereinafter "Meyer Decl., Ex. D, Lewis Tr.") 25: 5–7 |

7

| 64. | Cyril Lewis worked as a technician, and he installed cable, internet, and phone lines, performed service upgrades, and resolved service problems for residential and commercial users. | Meyer Decl., Ex. D, Lewis Tr., 25: 8–25; 26: 2–20; 27: 24–25; 28: 2-13 |
|---|---|---|
| 65. | Cyril Lewis believes he was paid on a piece-rate-basis because different rates were charged for the different tasks he performed. | Meyer Decl., Ex. D, Lewis Tr., 54: 25; 55: 2–25; 56: 2-12 |
| 66. | Cyril Lewis would earn more money if additional work was performed that was not additionally on the work order. | Meyer Decl., Ex. D, Lewis Tr., 106: 2–12 |
| 67. | Cyril Lewis says commission is like piecework, and he doesn't know how they calculated commission. | Meyer Decl., Ex. D, Lewis Tr., 82: 22–25; 83: 2–25; 84: 2–14 |
| 68. | Cyril Lewis does not know how the supposed piece-rates were calculated by VisionPro. | Meyer Decl., Ex. D, Lewis Tr., 56: 3–18 |
| 69. | Cyril Lewis's weekly earnings were based on the tasks he performed. | Meyer Decl., Ex. D, Lewis Tr., 56: 19–25; 57: 2–14 |
| 70. | Cyril Lewis signed the 2011 and 2013 Technician Commission Agreements while working at VisionPro. | Meyer Decl., Ex. D, Lewis Tr., 57: 23–25; 58: 2–5; 98: 19–25; 99: 2–4; *see also* Romano Decl., Ex. L, & N, "2011, and 2013 Technician Commission Agreements" pp. 3 of each exhibit. |
| 71. | Cyril Lewis says his paychecks would "be right" with the amount of jobs he received and how much he would be paid for each job. | Meyer Decl., Ex. D, Lewis Tr., 66: 7–25; 67: 2–4 |
| 72. | Cyril Lewis says the amount of money he was paid each week varied. | Meyer Decl., Ex. D, Lewis Tr., 78: 24–25; 79: 2-4 |
| 73. | Cyril Lewis signed the Acknowledgement of Receipt and Understanding of the VisionPro Corp. Employee Handbook for Technicians. | Meyer Decl., Ex. D, Lewis Tr., 103: 13–19 |
| 74. | Cyril Lewis signed a copy of the Policy on Recording Hours Worked. | Romano Decl., Ex. S, "Policy of Recording Hours Worked" |
| 75. | Cyril Lewis says the manner and structure in how his pay was calculated never changed; the dollar value fluctuated for the work he performed. | Meyer Decl., Ex. D, Lewis Tr., 109: 4–24 |

| 76. | Daren Watson and Cyril Lewis each signed copies of a "Notice and Acknowledgement of Wages" which described, inter alia, each person's rate of pay, basis of pay, overtime rate of pay, and regular pay day. | Romano Decl., Ex. O, "Notice and Acknowledgement of Wages." |
|---|---|---|

Dated:   Woodbury, New York
         October 22, 2014

**KAUFMAN DOLOWICH & VOLUCK, LLP**


By:_____/s/_____
       Sanjay V, Nair, Esq.- snair@kdvlaw.com
       Jeffery A. Meyer, Esq. – jmeyer@kdvlaw.com
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797
Phone: (516) 681-1100
Fax:  (516) 681-1101
*Attorneys for Defendants*


CC:   Peter A. Romero, Esq.
      Frank & Associates, P.C.
      500 Bi-County Blvd, 112N
      Farmingdale, New York 11735
      *Attorneys for Plaintiffs*


4816-2570-1663, v. 1