UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DAREN WATSON and CYRIL LEWIS,
on behalf of themselves and on
behalf of all other persons similarly situated,

                 Plaintiffs,
-against-

VISIONPRO COMMUNICATIONS CORP.,
VISIONPRO CORP., KEVIN SILVAR and
JOSEPH ROMANO,

                 Defendants.
-----------------------------------------------------------------X

Case No. 13-CV-0684 (LDW)(GRB)

**DECLARATION OF KEVIN SILVAR IN SUPPORT OF DEFENDANTS' MOTION FOR FLSA COLLECTIVE ACTION DECERTIFICATION**

I, **KEVIN SILVAR**, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1. I am a named, individual Defendant in the above-captioned action and an officer of Defendant VisionPro Corp. As such, I am fully familiar with the facts set forth herein.

### VisionPro

2. I was one of the owners of VisionPro Communications Corp., a now defunct entity. It is an inactive corporation and one that was succeeded in operations by VisionPro Corp. (hereinafter, "VisionPro"). VisionPro is an active, ongoing business, and the entity which employed the Plaintiffs.

3. VisionPro provides data, voice, fiber & cable installation, repair, maintenance, and problem solving services for residential and commercial customers of telecommunication providers. Since 2011, one telecommunication provider with which VisionPro contracted was Cablevision Systems Corporation ("Cablevision").

1

4. VisionPro received work orders from telecommunications providers to provide specified services to their subscribers. After the work is completed, VisionPro is compensated by the telecommunications provider according to a rate schedule for each individual type of service performed. I understand that one aspect of the commissioned-salesperson exemption upon which VisionPro relies upon requires that a certain percentage of revenues come from "sales." I can certify that one hundred percent of VisionPro's annual revenues are derived from the sale of cable/broadband installation and repair services.

5. VisionPro provides services to customers by employing "technicians," who are sent out into the field each day to go on service calls and perform customer installation and service requests. Technicians work in the field remotely and independently. They do not work out of any Company office. There is no direct oversight from VisionPro's management of technicians while they are out in the field. Plaintiffs Watson and Lewis were employed as technicians.

6. VisionPro's technicians perform services in the homes of the telecommunications provider's customers and at many businesses which also use the telecommunications provider's cable television, internet, or telephone services. None of the services that VisionPro's technicians provide to such customers are in any way resold by the customers, and upon information and belief, no such customers are re-selling any of the cable television, internet, or telephone services they receive from the telecommunications provider in their homes or businesses. These customers are the end-of-the-distribution-line consumers of the cable television, internet, and telephone services. They are not telecommunications providers themselves or telecommunications resellers.

## Technicians' Compensation

7. As stated, VisionPro is paid by the telecommunications provider for the services performed. In turn, the VisionPro technicians earn varying levels of commission (from a differing percentage amount of such payments) based upon the technicians different recognized skill levels and classifications, for the various services which they provide to the end-users.

8. Since the rates for the services provided VisionPro vary based on the type of activity performed, so does the amount of money earned by a technician performing the activities. The percentage of money earned by the technician is determined according to a technician's skill level and classification, and is proportional to that which VisionPro earns. Plaintiffs' claim that they are compensated as "pieceworkers" is creative at best. Essentially, Plaintiffs allege they receive a fixed amount of money for each service performed, with no relation or connection with the amount of money VisionPro itself earned for the work performed. This is patently false.

9. Annexed hereto as **Exhibit A** are documents titled "Residential Suburban Credits," which are a true and accurate copy of the records, kept in the ordinary course of business, that reflect the commissions that might be earned by technicians for their work for residential customers at various points since 2011. It is evident from that schedule that the amount of commission earned by technicians varies significantly based on the the service performed and the technicians tiered classification based upon his or her skills.

10. As a hypothetical example, as set forth on the first page of Exhibit A in the first row of the table, a "New Connect" of a "Video" (cable television) service remitted a "price" of $87.74 to VisionPro, of which an technician could receive anywhere between $26.32 to

3

$38.61 depending on the technician's classification level and the fixed percentage afforded to that level (30% for probationary technicians, 40% for Level I technicians, 42% for Level II technicians, and 44% technicians III). Comparatively, in the eighth row of the table, a "New Connect" of a "Digital Video/OOL/OV" (digital cable television, internet, and voice) service remitted a "price" of $117.44 to VisionPro, of which a technician could receive anywhere between $35.23 to $51.05 depending on the technician's classification level and the fixed percentage afforded to that level.

11. The method by which technicians earn commissions for work performed for commercial customers is identical to the way they earn commissions for work performed for residential customers, albeit with different rates paid by the telecommunications provider to VisionPro, and consequently different commissions paid out to technicians as a percentage of those rates.

12. In addition, each of VisionPro's technicians have a guaranteed floor to their weekly compensation, called the "Minimum Commission Payment Period," which consists of a minimum applicable wage for the hours worked by a technician, including an overtime premium for hours worked in excess of forty during a workweek. The "Minimum Commission Payment Period" ensures that a technician would at least be paid for the hours he worked during a given workweek should the technician's commissions for some reason fall beneath what the technician would make as a straight hourly employee (e.g., situations where a technician performed a number of jobs that were very time consuming but paid low commissions). At the applicable time, the "Minimum Commission Payment Period" provided $8.10 per hour for all hours worked up to 40 in a week and $12.15 per hour for all hours over 40 in a week.

13. A technician's gross compensation for the workweek, comprised of credits on the various types of work he performed, generally far exceeded the "Minimum Commission Payment Period," and the technician would receive that higher amount. Each credit is equivalent to a dollar when paid out.

14. The Weekly VisionPro Commission Summaries for each technician would regularly demonstrate that the amounts they each were paid for their commission credits, as "Total Gross Credits," consistently exceeded the "Minimum Commission Payment Period" for the technicians in VisionPro's employ.

15. Copies of Weekly Vision Pro Commission Summaries kept in the ordinary course of business for named Plaintiff Daren Watson are annexed hereto as **Exhibit B**) and for Cyril Lewis are annexed hereto as **Exhibit C.** The Technician Commission Agreements signed by the Plaintiffs are annexed as **Exhibit D**.

16. Over the representative period of each month, each technician garnered more than 50% of their earnings by way of the commission credits set forth as their "Total Gross Credits" (100% or so of their earnings, in fact), and each technician was expected to earn in excess of $10.88 per hour for all hours worked based on the hours they reported, in compliance with the commissioned-salesperson compensation structure.

17. If at any point during a day a technician efficiently completed all of their assigned jobs for the day and was still available to perform more work, they could request additional jobs or perform additional services requested by the customersso the technician could continue to earn more commissions during the day.

18. The number of hours worked by each technician, used in the calculation of the "Minimum Commission Period Payment" was recorded by the technicians themselves on

their daily time sheets. Each technician was obligated to record their start time, beginning of their lunch break, end of their lunch break, and end time for the day (denoting the time of day a technician would return their company vehicle to the shop or when they would telephone the shop to advise they would be taking their truck home for the evening and would not be coming into the shop). These recorded times, located on the top right of each daily time sheet a technician would complete, were then used to calculate the Minimum Commission Period Payment.

19. Annexed hereto as **Exhibit E** is a representative sample of daily time sheets for some workweeks identified on the Weekly VisionPro Commission Summaries for Daren Watson in Exhibit B. These records have been maintained in the ordinary course of business by the company.

20. Annexed hereto as **Exhibit F** is a representative sample of the daily time sheets for some workweeks identified on the Weekly VisionPro Commission Summaries for Cyril Lewis in Exhibit C. These records have been maintained in the ordinary course of business by the company.

21. Annexed hereto as **Exhibit G** are copies of the VisionPro Corp. Employee Handbook for Technicians, the last page of which, titled "Employee Handbook for Technicians Acknowledgement of Receipt and Understanding" are signed by Daren Watson and Cyril Lewis, respectively, as kept in the ordinary course of business by the company.

22. Annexed hereto as **Exhibit H** are copies of the Policy on Recording Hours Worked signed by Daren Watson and Cyril Lewis, as kept in the ordinary course of business by the company.

23. Annexed hereto as **Exhibit I** are copies of the Notice and Acknowledgement of Wages signed by Daren Wilson and Cyril Lewis kept in the ordinary course of business by the company.

### The Collective Action, As Currently Constituted, Is Overbroad

24. The list of putative FLSA collective action members that was produced to Plaintiffs' counsel was erroneously overbroad in time, geographic location, and/or job title, as the list essentially provided the names and addresses of every VisionPro employee, irrespective if when they worked, where they worked, and what they did.

25. Accordingly, several opt-in Plaintiffs incorrectly received a Notice of Pendency, as they do not fall within the collective definition set out by the Court's Order conditionally certifying this action (Dkt. No. 47 at 10) for the following reasons: (1) their FLSA claims are time-barred; (2) they performed services outside of the state of New York; (3) they were not employed by VisionPro as technicians; (4) they failed to timely file consent to join forms; or (5) they never worked for VisionPro.

FLSA Opt-in Plaintiffs Who Should Be Excluded Based on the Dates of Their Employment

26. A number of former employees who provided Consent forms to Plaintiffs' counsel for filing with the Court are effectively time-barred from bringing their claims because their employment exists even outside of the alleged FLSA liability period of three (3) years back, which Plaintiffs contend applies, from the date of the Court's July 14, 2014 Order. All of the Opt-In Plaintiffs discussed in paragraphs 27 through 49 below should have their claims dismissed as time-barred, and they should not be permitted to participate in this or any other trial or action.

27. Alix Muller had a date of hire of April 26, 2010 and an end date of June 4, 2010. Annexed hereto as **Exhibit J** is VisionPro's employee profile for Alix Muller which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

28. Vaughn Pennicott had a date of hire of January 3, 2010 and an end date of May 27, 2011. Annexed hereto as **Exhibit K** is VisionPro's employee profile for Vaughn Pennicott which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

29. Edgard Araya had a date of hire of July 20, 2010 and an end date of October 13, 2010. Annexed hereto as **Exhibit L** is VisionPro's employee profile for Edgard Araya which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

30. Eugene Barna had a date of hire of July 8, 2009 and an end date April 28, 2010. Annexed hereto as **Exhibit M** is VisionPro's employee profile for Eugene Barna which indicates "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

31. Jose Burgus had a date of hire of August 28, 2008 and an end date of April 26, 2010. Annexed hereto as **Exhibit N** is VisionPro's employee profile for Jose Burgus which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

32. Eric Burton had a date of hire of December 22, 2003 and an end date of January 10, 2011. Annexed hereto as **Exhibit O** is VisionPro's employee profile for Eric Burton

which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

33. Catray Demelva had a date of hire of December 6, 2006 and an end date of February 8, 2008. Annexed hereto as **Exhibit P** is VisionPro's employee profile for Catray Demelva which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

34. Reginald Exavier had a date of hire of December 22, 2009 and an end date of November 6, 2009. Annexed hereto as **Exhibit Q** is VisionPro's employee profile for Reginald Exavier which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

35. Steven Gordon had a date of hire of June 20, 2008 and an end date of April 20, 2009. Annexed hereto as **Exhibit R** is VisionPro's employee profile for Steven Gordon which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

36. Jason Grant had a date of hire of August 18, 2009 and an end date of November 6, 2009. Annexed hereto as **Exhibit S** is VisionPro's employee profile for Jason Grant which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

37. Kevin Herrera had a date of hire of June 24, 2009 and an end date of November 23, 2009. Annexed hereto as **Exhibit T** is VisionPro's employee profile for Kevin Herrera which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

38. Christopher Norton had a date of hire of February 4, 2009 and an end date of March 16, 2011. Annexed hereto as **Exhibit U** is VisionPro's employee profile for Christopher Norton which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

39. Euing Jupiter had a date of hire of April 3, 2008 and an end date of January 1, 2009. Annexed hereto as **Exhibit V** is VisionPro's employee profile for Euing Jupiter which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

40. Gabriel Michel had a date of hire of June 15, 2010 and an end date of September 1, 2010. Annexed hereto as **Exhibit W** is VisionPro's employee profile for Gabriel Michel which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

41. O'Brian Mair had a date of hire of December 29, 2009 and an end date of March 15, 2010. Annexed hereto as **Exhibit X** is VisionPro's employee profile for O'Brian Mair which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

42. Antoine Monroe had a date of hire of August 28, 2006 and an end date of May 4, 2008. Annexed hereto as **Exhibit Y** is VisionPro's employee profile for Antione Monroe which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

43. Aubrey McCoy had a date of hire of September 20, 2008 and an end date of March 17, 2009. Annexed hereto as **Exhibit Z** is VisionPro's employee profile for Aubrey McCoy

which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

44. Victor Rivera had a date of hire of October 31, 2007 and an end date of September 23, 2009. Annexed hereto as **Exhibit AA** is VisionPro's employee profile for Victor Rivera which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

45. Charles Tabron had a date of hire of October 13, 2008 and an end date of January 1, 2011. Annexed hereto as **Exhibit BB** is VisionPro's employee profile for Charles Tabron which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

46. Benson Videau had a date of hire of March 21, 2006 and an end date of March 30, 2009. Annexed hereto as **Exhibit CC** is VisionPro's employee profile for Benson Videau which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

47. Kabar Walker had a date of hire of September 8, 2010 and an end date of November 10, 2010. Annexed hereto as **Exhibit DD** is VisionPro's employee profile for Kabar Walker which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

48. Bernard Watkins had a date of hire of September 20, 2010 and an end date of November 13, 2010. Annexed hereto as **Exhibit EE** is VisionPro's employee profile for Bernard Watkins which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

49. Gilbert Wilson had a date of hire of August 14, 2007 and an end date of April 14, 2009. Annexed hereto as **Exhibit FF** is VisionPro's employee profile for Gilbert Wilson which indicates his "Hire Date" and "Term Date." This document is a record that was generated and maintained in the ordinary course of business by the company.

FLSA Opt-in Plaintiffs Who Should Be Excluded Based on Their Geographic Location

50. A number of former employees who provided Consent forms to Plaintiffs' counsel for filing with the Court did not work in the same state as the Plaintiffs did. All of the Opt-In Plaintiffs discussed in paragraphs 51 through 63 below must be excluded from any trial in this matter and their claims must be dismissed as Plaintiffs cannot demonstrate, and there is no evidence in the record, that technicians who performed work in any other jurisdictions were paid similarly to technicians in New York.

51. Hamdi Abdel-Nuur was a technician that was stationed in and worked in New Jersey. Annexed hereto as **Exhibit GG** is VisionPro's employee profile for Hamdi Abdel-Nuur which indicates his "DEPTMENT" or Department was in New Jersey. This document is a record that was generated and maintained in the ordinary course of business by the company.

52. Abdul Adesanya was an employee that was stationed in and also worked in New Jersey. Annexed hereto as **Exhibit HH** is VisionPro's employee profile for Abdul Adesanya which indicates his "DEPTMENT" or Department was in New Jersey. This document is a record that was generated and maintained in the ordinary course of business by the company.

53. David Anokye was an employee that was stationed in and also worked in New Jersey. Annexed hereto as **Exhibit II** is VisionPro's employee profile for David Anokye which

indicates his "DEPTMENT" or Department was in New Jersey. This document is a record that was generated and maintained in the ordinary course of business by the company.

54. Samuel Ayebi was an employee that was stationed in and also worked in Connecticut. Annexed hereto as **Exhibit JJ** is VisionPro's employee profile for Samuel Ayebi which indicates his "DEPTMENT" or Department was in Connecticut. This document is a record that was generated and maintained in the ordinary course of business by the company.

55. Edward Demarchena was an employee that was stationed in and worked in New Jersey. Annexed hereto as **Exhibit KK** is VisionPro's employee profile for Edward Demarchena which indicates his "DEPTMENT" or Department was in New Jersey. This document is a record that was generated and maintained in the ordinary course of business by the company.

56. Lensworth Gibbs was an employee that was stationed in and worked in Connecticut. Annexed hereto as **Exhibit LL** is VisionPro's employee profile for Lensworth Gibbs which indicates his "DEPTMENT" or Department was in Connecticut. This document is a record that was generated and maintained in the ordinary course of business by the company.

57. John Lowell was an employee that was stationed in and also worked in Connecticut. Annexed hereto as **Exhibit MM** is VisionPro's employee profile for John Lowell which indicates his "DEPTMENT" or Department was in Connecticut. This document is a record that was generated and maintained in the ordinary course of business by the company.

58. Sergio Pichardo was another employee that was stationed in and worked in Connecticut. Annexed hereto as Exhibit **NN** is VisionPro's employee profile for Sergio Pichardo which indicates his "DEPTMENT" or Department was in Connecticut. This document is a record that was generated and maintained in the ordinary course of business by the company.

59. Joseph Ramson was an employee that was stationed in and worked in New Jersey. Annexed hereto as **Exhibit OO** is VisionPro's employee profile for Joseph Ramson which indicates his "DEPTMENT" or Department was in New Jersey. This document is a record that was generated and maintained in the ordinary course of business by the company.

60. Kevin Rivera was another employee that was stationed in and worked in Connecticut. Annexed hereto as **Exhibit PP** is VisionPro's employee profile for Kevin Rivera which indicates his "DEPTMENT" or Department was in Connecticut. This document is a record that was generated and maintained in the ordinary course of business by the company.

61. James Sanders also was stationed in and worked in Connecticut. Annexed hereto as **Exhibit QQ** is VisionPro's employee profile for James Sanders which indicates his "DEPTMENT" or Department was in Connecticut. This document is a record that was generated and maintained in the ordinary course of business by the company.

62. Daniel Roman was stationed in and worked in New Jersey. Annexed hereto as **Exhibit RR** is VisionPro's employee profile for Daniel Roman which indicates his "DEPTMENT" or Department was in Connecticut. This document is a record that was generated and maintained in the ordinary course of business by the company.

63. Jermin Lee also was an employee who was stationed in and worked in New Jersey. Annexed hereto as **Exhibit SS** is VisionPro's employee profile for Jermin Lee which indicates his "DEPTMENT" or Department was in New Jersey. This document is a record that was generated and maintained in the ordinary course of business by the company.

FLSA Opt-in Plaintiffs Who Should Be Excluded Based on Their Job Title and Responsibilities

64. A number of current and former employees who provided Consent forms to Plaintiffs' counsel for filing with the Court were not employed as VisionPro technicians. All of the Opt-In Plaintiffs discussed in paragraphs 65 through 67 below cannot participate in this or any other trial for that reason.

65. Abdul Adesanya was employed by VisionPro as a manager in New Jersey, and was not employed as a technician. VisionPro's employee profile for Adbul Adesanya, annexed hereto again as Exhibit GG, indicates that within his "DEPTMENT" or Department he was employed as a manager in New Jersey.

66. Ahriyah Gad was employed as supervisor in Brooklyn, New York, and was not employed as a technician. VisionPro's employee profile for Ahriyah Gad, annexed hereto as **Exhibit TT**, indicates that within his "DEPTMENT" or Department he was employed as a supervisor in Brooklyn. This document is a record that was generated and maintained in the ordinary course of business by the company.

67. Charles Howell was employed as a mechanic in Brooklyn, New York, and was not employed as a technician. VisionPro's employee profile for Charles Howell, annexed hereto as **Exhibit UU**, indicates that within his "DEPTMENT" or Department he was

employed as a mechanic in Brooklyn. This document is a record that was generated and maintained in the ordinary course of business by the company.

### FLSA Opt-in Plaintiffs Who Should Be Excluded Based On His Non-Employment

68. A person by the name of Daniel Felsaime filed a Consent to Join form. To my knowledge no person with that name has ever worked for VisionPro, and there is not record of a person with that name having ever worked for the company. His name does not appear on the list of putative FLSA Collective Action Opt-in Plaintiff that was provided to Plaintiffs' counsel after conditional certification of the Collective Action was granted. I do not know how he received a Consent to Join form, or why he filed the same. As he does not appear to be technician employed during the liability period, he should be excluded from any FLSA Collective Action.

### Other Documents Pertinent to Defendants' Motion for Decertification

69. Annexed hereto as **Exhibit VV** is a true and correct copy of the pages from the transcript of the June 20, 2014 deposition of Daren Watson which are cited in Defendants' motion.

70. Attached hereto as **Exhibit WW** is a true and correct copy of the pages from the transcript of the February 20, 2014 deposition of Cyril Lewis which are cited in Defendants' motion.

71. Attached hereto as **Exhibit XX** is a true and correct copy of the pages from the transcript of the July 10, 2014 deposition of Joseph Romano which are cited in Defendants' motion.

72. Attached hereto as **Exhibit YY** is a true and accurate copy of *Plaintiff's* [sic] *Rule 26(A) Initial Disclosure*, dated August 5, 2013.

73. Attached hereto as **Exhibit ZZ** is a true and accurate copy of *Plaintiff's* [sic] *Response to Defendants' First Set of Interrogatories*, dated September 27, 2013.

WHEREFORE, Defendants respectfully request that the Court grant their application to decertify the Conditionally Certified Collective Action, and grant Defendants such other and further relief as is just and warranted.

Dated: January 11, 2016
      Farmingdale, New York

_____
Kevin Silvar

4834-1041-2844, v. 1